David STEVENS et al., Plaintiffs,

v.

Stephen BERGER, Individually and as Commissioner of New York State Department of Social Services, et al., Defendants.

No. 76 C 1554.

United States District Court,
E. D. New York.

March 3, 1977.

McEvily & Kluewer, Community Legal Assistance Corp., Hempstead, N.Y., by Charles McEvily and Steven Satkin, Legal Intern, for plaintiffs.

Jonathan A. Weiss and Mary Susan Birkett, Legal Services for the Elderly Poor, New York City, amicus for plaintiffs.

Louis J. Lefkowitz, Atty. Gen., New York City, by Joan P. Scannell, Asst. Atty. Gen., New York City, for defendant Stephen Berger.

Jerome A. Campo, Hauppauge, N.Y., for defendant James E. Kirby.

David G. Trager, U.S. Atty., E.D.N.Y., Brooklyn, N.Y., by Leonard A. Sclafani, Asst. U.S. Atty., for defendant Joseph Califano.

WEINSTEIN, District Judge.

Plaintiffs Virginia and David Stevens, acting for themselves and on behalf of their four minor children, seek a permanent injunction prohibiting the State of New York Department of Social Services, the Suffolk County Department of Social Services, and the United States Department of Health, Education and Welfare from withdrawing their welfare benefits. Insistence that the children obtain social security numbers as a condition of continued public assistance allegedly violates their right of free exercise of religion under the First Amendment of the United States Constitution and their right to privacy. While the social security number requirement is designed to reduce fraud by welfare recipients, in the particular circumstances of this case it does violate plaintiffs' rights.

I.  Factual and Statutory Background

The Stevens family was receiving Home Relief aid from the state, supplementing their below-subsistence private income. New York Social Services Law §§ 157 *et seq.* In January 1976, they received notice from the Suffolk County Department of Social Services that they were to supply a photostatic copy of each child's social security card, as required by New York's Welfare Regulations. 18 N.Y.C.R.R. § 351.2(c).

The Stevenses replied that the children had no social security numbers and that, because of their religious convictions, the parents would not obtain such numbers for them. They explained that, in their view, the use of social security numbers was a device of the Antichrist, and that they feared the children, if numbered in this way, might be barred from entering Heaven. (The adult Stevenses had obtained social security numbers years earlier, before developing their current convictions, and those numbers had been duly supplied to the Department of Social Services.)

Hoping to find some compromise solution, the Stevenses sought to cooperate with the department to develop an alternative way to identify their children for the welfare system's record-keeping needs. The offer was rejected.

The Stevenses unsuccessfully challenged the decision to cease aid at a hearing before the county. In August, the Commissioner of the New York State Department of Social Services affirmed the county's decision, and payments to the Stevenses under the Home Relief program were discontinued. The plaintiffs then instituted this action seeking injunctive and declaratory relief. A temporary injunction restored the plaintiffs to the relief rolls.

Before the trial, Mr. Stevens lost his job. The family, for this reason, was no longer entitled to Home Relief but was within the ambit of a federally-funded welfare program. Plaintiffs were permitted to file an amended complaint, naming the Department of Health, Education and Welfare as an additional defendant, since each member of a family receiving monies under national welfare programs must also supply a social security number as identification.

The Social Service Amendments of 1975 mandated that the numbers be provided to obtain assistance under Aid to Families with Dependent Children. P.L. 93–647. The applicable federal statute now reads:

(A) that, as a condition of eligibility under the plan, each applicant for or recipient of aid shall furnish to the State agency his social security account number (or numbers, if he has more than one such number), and (B) that such State agency shall utilize such account numbers, in addition to any other means of identification it may determine to employ in the administration of such plan. . . .

42 U.S.C. § 602(a)(25), P.L. 93–647, 88 Stat. 2337. It was approved on January 4, 1975, four days after a seemingly contradictory segment of the Federal Privacy Act, P.L. 93–579, was passed. The Privacy Act provides that:

It shall be unlawful for any Federal, State or local government agency to deny to any individual any right, benefit, or privilege provided by law because of such individual's refusal to disclose his social security account number.

P.L. 93–579, § 7(a)(1), 88 Stat. 1896, reprinted in 5 U.S.C.A. § 552a, note at 98 (Cum. Supp.1976). There is no need to deal with this apparent conflict, however, since section 7 of the Privacy Act then goes on specifically to exempt from its provisions "any disclosure which is required by Federal statute". P.L. 93–579, § 7(a)(2)(A), 88 Stat. 1896, reprinted in 5 U.S.C.A. § 552a, note at 98 (Cum.Supp.1976). Moreover, section 1211(b) of the Tax Reform Act of 1976, P.L. 94–455, 90 Stat. 1711, amending 42 U.S.C. § 405, explicitly provides that, notwithstanding prior law, social welfare agencies may require applicants for aid to supply their social security numbers as a prerequisite for qualifying for aid. The pertinent portion of section 1211 reads as follows:

(C)(i) It is the policy of the United States that *any State (or political subdivision thereof) may, in the administration of any* tax, *general public assistance,* driver's license, or motor vehicle registration law within its jurisdiction, *utilize the social security account numbers issued by the Secretary for the purpose of establishing the identification of individuals* affected by such law, and may require any individual who is or appears to be so affected to furnish to such State (or political subdivision thereof) or any agency thereof having administrative responsibility for the law involved, the social security account number (or numbers, if he has more than one such number) issued to him by the Secretary.

(ii) If and to the extent that *any provision* of Federal law heretofore enacted is *inconsistent* with the policy set forth in clause (i) of this subparagraph, such provision *shall,* on and after the date of the enactment of this subparagraph, *be null, void, and of no effect.*

(iii) For purposes of clause (i) of this subparagraph, *an agency of a State* (or political subdivision thereof) charged

with the administration of any general public assistance, driver's license, or motor vehicle registration law which did not use the social security account number for identification under a law or regulation adopted before January 1, 1975, *may require an individual to disclose his or her social security number* to such agency solely for the purpose of administering the laws referred to in clause (i) above and for the purpose of responding to requests for information from an agency operating pursuant to the provisions of part A or D of title IV of the Social Security Act.

P.L. 94-455 § 1211(b). *See also,* H.Conf. Rep.No.94-1515 at 490-91, 94th Cong., 2d Sess. (1976).

Because this case so clearly presents a dispositive First Amendment issue, there is no need to reach the question posed by plaintiffs of whether some constitutional right to privacy under the First, Third, Fourth, Fifth, Ninth and Fourteenth Amendments has been violated by the social security number requirement. We turn, therefore, to the issue of religious belief.

## II. Requirement that Belief be Religious and Sincere

■ Not every belief put forward as "religious" is elevated to constitutional status. As a threshold requirement, there must be some reasonable possibility 1) that the conviction is sincerely held and 2) that it is based upon what can be characterized as theological, rather than secular—*e. g.,* purely social, political or moral views. *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (Amish Mennonite Church members' religiously-grounded desire—as contrasted to Thoreau-like rejection of current secular values—to keep children out of high school outweighed state interest in compulsory attendance law); *United States v. Seeger,* 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965) (religious belief, as compared to personal moral code or political, sociological or economic considerations, outweighs government's need for compulsory military training); *Teterud v. Burns,* 522

F.2d 357 (8th Cir. 1975) (wearing of long, braided hair by Indian matter of religion, not esthetics); *Theriault v. Carlson,* 495 F.2d 390 (5th Cir.), *cert. denied,* 419 U.S. 1003, 95 S.Ct. 323, 42 L.Ed.2d 279 (1974) (issue of whether Eclatarian movement is religious or political anti-authoritarianism); *Founding Church of Scientology of Washington v. United States,* 133 U.S.App.D.C. 229, 409 F.2d 1146 (1969), *cert. denied,* 396 U.S. 963, 90 S.Ct. 434, 24 L.Ed.2d 427 (1969) (issue of whether Scientology and "auditing" are religious, or are false labeling of medical devices); *United States v. Kahane,* 396 F.Supp. 687 (E.D.N.Y.1975) (issue of whether special diet was religious need). *See also,* Greenawalt, Book Review (Konvitz, Religious Liberty and Conscience: A Constitutional Inquiry), 70 Colum.L.Rev. 1133, 1135-36 (1970); Note, *Free Exercise of Religion in Prisons—The Right to Observe Dietary Laws,* 45 Ford.L.Rev. 92 (1976).

■ The court, in undertaking this difficult and sensitive factfinding task, recognizes stringent limitations on its right of inquiry. Under the United States Constitution, an individual's right to believe in anything he or she chooses is unquestioned. Religious beliefs are not required to be consistent, or logical, or acceptable to others. Governmental questioning of the truth or falsity of the beliefs themselves is proscribed by the First Amendment. *Cantwell v. State of Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940); *United States v. Ballard,* 322 U.S. 78, 86, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944). A religious belief can appear to every other member of the human race preposterous, yet merit the protections of the Bill of Rights. Popularity, as well as verity, are inappropriate criteria.

> Freedom of thought, which includes freedom of religious belief, is basic in a society of free men. . . . It embraces the right to maintain theories of life and of death and of the hereafter which are rank heresy to followers of the orthodox faiths. Heresy trials are foreign to our Constitution. Men may believe what

they cannot prove. They may not be put to the proof of their religious doctrines or beliefs. Religious experiences which are as real as life to some may be incomprehensible to others. . . . The Fathers of the Constitution were not unaware of the varied and extreme views of religious sects, of the violence of disagreement among them, and of the lack of any one religious creed on which all men would agree. They fashioned a charter of government which envisaged the widest possible toleration of conflicting views. Man's relation to his God was made no concern of the state. He was granted the right to worship as he pleased and to answer to no man for the verity of his religious views.

*United States v. Ballard,* 322 U.S. 78, 86–87, 64 S.Ct. 882, 886–87, 88 L.Ed. 1148 (1944).

█ When, however, an individual seeks to act on a belief, and that action poses a threat or inconvenience to other citizens, or to some important aspect of public law and policy, the requirements of an ordered society may demand that the courts make limited inquiry into bona fides. *Cantwell v. Connecticut,* 310 U.S. 296, 303–04, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940); *Founding Church of Scientology v. United States,* 133 U.S.App.D.C. 229, 409 F.2d 1146, 1154–55 (1969). The difficulty of the investigation is compounded where the relevant belief does not, on its face, fit into any generally recognizable religious framework. As one court recently observed:

> In order to determine if First Amendment rights of free exercise of religion have been or are being infringed upon, the Court must initially determine whether or not a religion or religious beliefs are actually involved. The task is, of course, greatly simplified where an historically established and recognized religion such as Islam, Judaism or Catholicism is involved. But where, as in the instant case, a newly established allegedly legitimate religion is involved the Court is necessarily put to the difficult task of determining whether a religion or religious activity is in fact involved.

*Theriault v. Silber,* 391 F.Supp. 578, 580 (W.D.Tex.1975).

█ Delicacy in probing and sensitivity to permissible diversity is required, lest established creeds and dogmas be given an advantage over new and changing modes of religious belief. Neither the trappings of robes, nor temples of stone, nor a fixed liturgy, nor an extensive literature or history is required to meet the test of beliefs cognizable under the Constitution as religious. So far as our law is concerned, one person's religious beliefs held for one day are presumptively entitled to the same protection as the beliefs of millions which have been shared for thousands of years. Nevertheless, it is—as a matter of evidence and probative force—far easier to satisfy triers that beliefs are religious if they are widely-held and clothed with substantial historical antecedents and traditional concepts of a deity than it is where such factors are absent. Judges recognize intellectually the existence of new religious harmonies, but they respond more readily and feelingly to the tones the founding fathers recognized as spiritual.

For example, in *People v. Woody,* 61 Cal.2d 716, 40 Cal.Rptr. 69, 394 P.2d 813 (1964), the court decided that the use of the hallucinogen peyote by Indians in the ceremonies of the Native American Church was a valid expression of religious beliefs and not an unprivileged violation of the drug laws. But the court, in reaching this decision, relied in part upon evidence of a long history and a large membership. In *United States v. Seeger,* 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965), the court distinguished a new class of religious objectors who did not believe in a Supreme Being in a traditional sense from those whose objections to the draft were personal and moral in nature. In doing so, however, the Court cited an extensive supporting literature from the pens of those generally acknowledged to be leaders of traditional religious institutions.

Although support from tradition, history or authority is not required, without it a plaintiff may be unable to produce enough

other evidence of religiosity to satisfy this preliminary burden. A prisoners' religious sect, calling itself the Church of the New Song of Universal Life, demanded a series of special privileges, including the right to hold services in secret. Three cases involving the sect were considered in *Theriault v. Carlson*, 495 F.2d 390 (5th Cir.), *cert. denied*, 419 U.S. 1003, 95 S.Ct. 323, 42 L.Ed.2d 279 (1974). Two were remanded for full evidentiary hearings on the issue of whether the movement was political or genuinely religious. As an evidentiary matter, a district court in Texas concluded that the doctrine was:

> a relatively non-structured, free-form, do-as-you-please philosophy, the sole purpose of which is to cause or encourage disruption of established prison discipline for the sake of disruption. Disruption of and/or problems for prison authorities is not the *result* of this so-called religion; it is rather the underlying *purpose* of it.

*Theriault v. Silber*, 391 F.Supp. 578, 582 (W.D.Tex.1975). Consequently, no First Amendment issue had been raised. The case before us is, on the evidence, far different from *Theriault.*

### A.  Sincerity of Plaintiffs' Beliefs

As the Supreme Court declared in *United States v. Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 863, 13 L.Ed.2d 733 (1965), the "significant question" is whether a belief is "truly held". "This is the threshold question of sincerity which must be resolved in every case." *Id.*

David and Virginia Stevens are members of the St. John's Lutheran Church in Massapequa, New York. They characterize their religion not as Lutheranism, but as "Messianic Judaism". They profess a belief in both the Old and the New Testaments, and view Christ not as the founder of a new faith but as the Messiah of the Jews. Among their religious traditions are the keeping of Shabbot as well as other Jewish holy days and festivals.

■ After observing plaintiffs during the trial, after hearing their testimony and that of their minister, Pastor Jack Hickman, and after considering all the other evidence, the court is left with no doubt of the sincerity of their belief regarding social security numbers. Plaintiffs do believe that, were their children to obtain these numbers, their spiritual well-being and chance to enter Heaven would be seriously jeopardized; since the children would not be able to shed these numbers when they reach adulthood, a decision by the parents to comply would effectively foreclose the children from deciding the question anew for themselves in the future. The testimony of Pastor Hickman sums up the matter. "I believe their beliefs are sincere," he said, "and I don't believe they would have gone through all this if they were not."

### B.  Religious Foundations of Plaintiffs' Beliefs

■ Once the question of sincerity is resolved, the next question is whether the belief is rooted in what may loosely be characterized as theological conviction, or whether it is the expression of some political or social ideology. The evidence is overwhelming that the belief is one which would meet any reasonable test of what is "religious".

A trier of fact faced with a First Amendment claim must necessarily come to terms with this distinction. History is replete with examples of persons who gave up, not just public benefits, but family, country and even life itself for their dedication to such sectarian ideals as political freedom or social egalitarianism. What the Supreme Court had to say about the belief of the Amish that their children should not attend public schools beyond the eighth grade is equally applicable to this case:

> Although a determination of what is a "religious" belief or practice entitled to constitutional protection may present a most delicate question, the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests. Thus, *if the Amish asserted their claims because of their subjective evaluation and rejec-*

*tion of the contemporary secular values* accepted by the majority, much as Thoreau rejected the social values of his time and isolated himself at Walden Pond, *their claims would not rest on a religious basis.* Thoreau's choice was philosophical and personal rather than religious, and such belief does not rise to the demands of the Religion Clauses.

*Wisconsin v. Yoder,* 406 U.S. 205, 215–16, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972) (footnote omitted) (emphasis supplied). Whether Thoreau's counsel might have convinced the Court that it was wrong to place that author's beliefs beyond the pale of constitutional religious protection, the Court's view that the Amish were safely within the boundaries was highly favorable to these plaintiffs.

It is clear from the evidence that plaintiffs' views have their roots, not in secular civil-libertarianism, but in religion. Others may have political objections to the increasing use of social security numbers. *See, e. g.,* American Civil Liberties Union Foundation, The Privacy Report Volume III, No. 1 (Aug. 1975); Privacy Protection Study Commission, The Use of the Social Security Number in the Private Sector (Memorandum, Oct. 22, 1975); S.Rep.No.93–1183, *in* U.S.Code Cong. & Admin.News No. 14 at 8066 (Jan. 30, 1975). But plaintiffs do not reach their conclusion by political reasoning; theirs is the world of the spirit, not the flesh. They express a fear that the social security number is fast becoming what they describe as a "universal number" and that, as such, it is an instrument of the Antichrist. Mrs. Stevens declared with obvious sincerity:

> I believe that an Antichrist . . . will establish a system of numbers and will cause all people to have these numbers . . . [I]f they do not have them they will not be able to pay or sell or function . . . in society.
>
> . . . . . .
>
> Q. What is it about the social security number that makes it unique according to your belief . . . ?
>
> A. The fact that, unlike other numbers, you must use it to work, you must have it to cash checks which would then lead to buying things—bank accounts. It is used for identification and without it you would have a pretty hard time functioning in society. . . . I think that is a pretty good description of the numbers the Antichrist will use.
>
> Q. Because of the power behind it, are you saying?
>
> A. Yes, the power behind it; the power it holds over you . . . to control human life.

The primary source to which the plaintiffs point in support of their beliefs is biblical: the thirteenth chapter of the New Testament *Book of Revelation.* The American Lutheran Church, the denomination to which the Stevenses belong, apparently does not have a doctrinal interpretation of Chapter 13, or any doctrine generally concerning the Antichrist. Instead, testimony credited by the court indicated, individual members are encouraged to study the Bible and develop for themselves a personal understanding of its teachings. *Constitution of the American Lutheran Church, reprinted in* Handbook of the American Lutheran Church 45 (1975). Thus, it is not surprising to find that the Stevenses hold highly individualized beliefs as part of their general adherence to an orthodox religious tradition. To borrow a phrase from the Supreme Court in *Wisconsin v. Yoder,* the plaintiffs' belief is simply a "response to their literal interpretation of [a] Biblical injunction . . . ." 406 U.S. at 216, 92 S.Ct. at 1533.

The reference to a scriptural source for the belief, plus the testimony by plaintiffs and their pastor about the study and reflection that led to its birth might well by themselves lead the court to conclude that the Stevenses' aversion to the use of social security numbers has no secular component. There is additional evidence in this case, however, which supports the plaintiffs' position. No finding as to the historical accuracy and theological soundness of these

plaintiffs' contentions are made since such judgments should be avoided by the courts. It also bears reiteration that "The validity of what he [or she] believes cannot be questioned." *United States v. Seeger,* 380 U.S. 163, 184, 85 S.Ct. 850, 863, 13 L.Ed.2d 733 (1965). "The religious views espoused by [plaintiffs] might seem incredible, if not preposterous, to most people. But . . those doctrines are [not] subject to trial . . .." *United States v. Ballard,* 322 U.S. 78, 87, 64 S.Ct. 882, 887, 88 L.Ed. 1148 (1944). The evidence does support plaintiffs' contention that there is some arguable theological basis for their beliefs.

Both the trial testimony and the literature relied upon by plaintiffs indicated that, in western theology, a long and deepseated tradition exists of conflict between God and state—more specifically, a belief that an omnipowerful state will usurp the place of God on earth, and destroy those who will not make obeisance to the state. Out of this tradition comes, according to plaintiffs, the scriptural reference to what plaintiffs' witnesses refer to as the "mark of the Beast"—in the Stevenses' view, social security numbers.

The plaintiffs' expert, Dr. Willis E. Elliott, is an ordained minister of the United Church of Christ well versed in scriptural interpretation, with doctorates from the University of Chicago and from the Northern Baptist Theological Seminary. He explained that the *Book of Revelation* was written about 96 A.D., a particularly bleak time for early Christians who faced genocide under the edicts of the Roman emperor Domitian. Yet the imagery, apocalyptic tone, and the central concern with the figure of an Antichrist, he said, is adapted from earlier sources.

In the Old Testament, the seventh chapter of the *Book of Daniel* tells of Daniel's dream in which he saw "four great beasts . . . from the sea, diverse one from another", who ruled the earth until that kingdom was finally recaptured by "*one* like the Son of man" who would rule on for eternity. *Daniel* 7:3,13. In *Daniel,* according to plaintiffs' interpretation, the beasts are explicitly political powers who prevail for a time against the forces of God. *Daniel* 7:24–27. The "Son of man" who will ultimately conquer these forces is, according to plaintiffs' contention, the predicted Messiah of the Jews.

*Daniel,* like *Revelation* some two-and-a-half centuries later, grew, according to the testimony, out of a historical context threatening destruction of a religious group. The original model for the Antichrist, Antioches Epiphanes, was king of Syria from 175 to 163 B.C. During his reign, Antioches attempted to Hellenize his domain, and part of his program for accomplishing cultural homogenization was the destruction of the Jewish religion. *See* C. M. Laymon, The Interpreter's One-Volume Commentary on the Bible 13–14 (1971); The Columbia Encyclopedia 85 (2d ed. W. Bridgewater & S. Kurtz 1963). Instead, he inspired the revolt of the Maccabees.

Dr. Elliott described quite fully in his testimony his analysis of the perception Jews and Christians had of overweening secular authority.

The Antichrist is merely the reverse Christ and since Christ is a [Greek translation of a] Jewish word, the whole Messianic expectation of the Jews is involved in the Antichrist.

. . . . .

The reason Jews no longer use the term "Antichrist" is because the word "Christ" . . . has gotten hooked narrowly into Christianity. But it has always [meant] the threat and destruction to human liberty and life.

The threat of annihilation for the early Christians, plaintiffs explain, began with Emperor Nero who fixed the blame for the great fire that destroyed Rome in 64 A.D. on that fledgling religious community. The Columbia Encyclopedia 1478 (2d ed. W. Bridgewater & S. Kurtz 1963). The persecution was continued under Domitian. Once more, secular authority came into direct conflict with religious authority. The imagery of the Antichrist was particularly apt as applied to Roman emperors who elevated themselves above the temporal by

claiming deification and the right to be worshipped as well as obeyed. This was the ultimate forging together of church and state, and the vision drawn upon by John of Patmos in composing the *Book of Revelation.*

The fear expressed by the Stevenses of rendering too much to Caesar is not, according to the uncontradicted testimony, too different from the fear expressed by St. John, although the historical context is radically different. John was urging Christians not to compromise their faith by paying lip service to the cult of the emperor— that is to say, worship of the state. The Interpreter's Dictionary of the Bible 745 (Supp.1976).

In the thirteenth chapter of the *Book of Revelation* —the passage on which the Stevenses contend their belief is primarily based—John writes of two great beasts, one coming up from the sea and the other from the land. Evidence presented by plaintiffs suggest agreement among scholars that the beast from the sea symbolizes the Emperor, while the beast from the land represents his priests who "exerciseth all the power of the first beast . . . and causeth the earth and them which dwell therein to worship the first beast. . . ." *Revelation* 13:12; A. E. Harvey, The New English Bible: Companion to the New Testament 820 (1970).

According to St. John, the second beast had power to kill those who would not worship the first. In addition,

16. [H]e causeth all, both small and great, rich and poor, free and bond, to receive a mark in their right hand, or in their foreheads:

17. And that no man might buy or sell, save he that had the mark, or the name of the beast, or the number of his name;

18. Here is wisdom. Let him that hath understanding count the number of the beast: for it is the number of a man; and his number *is* Six hundred threescore *and* six.

*Revelation* 13:16–18.

The "mark of the Beast" is what, according to plaintiffs' expert, sorts out those who are in favor with the temporal powers from those who will not survive the regime. This is the passage that the Stevenses say was the origin of their opposition to accepting the "mark" of the social security number. What the "mark", as referred to by John, was cannot be identified with certainty. A. E. Harvey, The New English Bible: Companion to the New Testament 820–21 (1970), suggests the mark was the coinage of Rome, bearing the image and titles of the emperor, which was handled in every commercial transaction in the Empire. Another commentator suggests that the mark was a brand, similar to that used to mark slaves. A. Farrer, The Revelation of St. John the Divine 157 (1964). Dr. Elliott, in his expert testimony at the trial, offered an alternative explanation:

[The emperor's priests] were functioning, not as we would think religious priests would, but rather as police to bring in the Christians and they had to have some way of identifying these Christians and they would ask them for their pass.

Their pass was called a libellus, made of papyrus and it said on it— . . . we have some of these from way back in the first century—and it said: I have sacrificed to the Emperor and then it had the signature.

All you had to do to sacrifice was to place a pinch of incense on the altar of . . . the Emperor, and that was it.

You signed, the priest signed and every time you got nailed by the police you could show your passport.

If you didn't have it, the libellus, you could be dragged into court and executed the same day. This was instant death.

That is the mark of the beast.

While these highly scholarly explanations of the meaning of the mark are all plausible, the interpretation of the Stevenses that it is a number is also straightforward. The Scripture speaks of the number of the Beast, and says that it is 666. *Revelation* 13:18. Modern scholars, the testimony indicated, assume that 666 is an example of

gematria, a device by which letters are translated into their numerical equivalent. It may stand for the Emperor Domitian. G. B. Caird, A Commentary on the Revelation of St. John the Divine 174–75 (1966). Or it may refer to Nero. *Id.* at 175; R. H. Charles, I A Critical and Exegetical Commentary on the Revelation of St. John 367 (1920). In either case, the number represented ruthless power backed by the forces of the Roman Empire and pitted against a discrete sect of religious nonconformists.

The meaning of the mark to theologians—whatever they believe the mark to have been—is strikingly similar to the meaning for the Stevenses, who see a potential for abuse of the spiritual side of humanity in a number which could act as a universal identifier. R. H. Charles in his commentary says:

> The object of enforcing the wearing of the mark is not the minor one of cutting off the recusants from buying and selling. . . . [T]he penalty of such recusancy is immediate death. The necessaries of life are to be withheld from such as have not the mark of the beast in order to bring them under the notice of the imperial authorities. . . . A ruthless economic warfare is here proclaimed with a view to the absolute supremacy of the State. This is not represented as a fact of the present but as the future in store for the inhabitants of the earth.

R. H. Charles, A Critical and Exegetical Commentary on the Revelation of St. John 363 (1920).

Since having a social security number in this society has become a prerequisite for so many of the society's benefits (both from the public and private sectors), no great leap of imagination is necessary to travel from the exegesis of *Revelation* to the plaintiffs' belief that such numbers could function, if the state were to become too powerful, like the mark of the Antichrist spoken of in the biblical text. With the history and literature marshalled by plaintiffs to support their contention, their belief must be characterized as religious for purposes of this case.

## III. Balancing State Against First Amendment Interests

Our law has long acknowledged the profound respect which is due the judgment of parents as to the activities of their children. *See Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). This has been particularly true in the area of religious training, a subject which first received special attention in *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). As the Supreme Court noted many years later in *Wisconsin v. Yoder,* "[T]he . . . holding in *Pierce* stands as a charter of the rights of parents to direct the religious upbringing of their children." 406 U.S. 205, 233, 92 S.Ct. 1526, 1542, 32 L.Ed.2d 15 (1972). *See also West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943); *Prince v. Commonwealth of Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944).

> The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition.

*Wisconsin v. Yoder,* 406 U.S. at 233, 92 S.Ct. at 1541–42.

Thus, in any consideration of the issues in this case, the combination of the Stevenses' religious and parental rights will weigh heavily in their favor. These rights, however, are not absolute. As the Court pointed out in *Yoder,*

> [W]hen the interests of parenthood are combined with a free exercise claim of the nature revealed by this record, more than merely a "reasonable relation to some purpose within the competency of the State" is required to sustain the validity of the State's requirement under the First Amendment. . . . [T]he power of the parent, even when linked to

a free exercise claim, may be subject to limitation . . . if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens. 406 U.S. at 233–34, 92 S.Ct. at 1542. *See Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944).

■ What is, in essence, involved is a balancing of the interests of the plaintiffs in the free exercise of their religion against the governmental interest in the challenged policy or statute. "The gain to the subordinating interest provided by the [challenged governmental] means must outweigh the incurred loss of protected rights," *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 2684, 49 L.Ed.2d 547 (1976), before an infringement of those protected rights will be countenanced.

■ Once a bona fide First Amendment issue is joined, the burden that must be shouldered by the government to defend a regulation with impact on religious actions is a heavy one. The basic standard was set out for freedom of religion cases by the Supreme Court in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). There the Court said that a "compelling state interest" must be demonstrated.

> It is basic that no showing merely of a rational relationship to some colorable state interest would suffice; in this highly sensitive constitutional area, "[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation," *Thomas v. Collins,* 323 U.S. 516, 530, 65 S.Ct. 315, 323, 89 L.Ed. 430.

374 U.S. at 406, 83 S.Ct. at 1795. The Court has recently emphasized this norm:

> It is firmly established that a significant impairment of First Amendment rights must survive exacting scrutiny. . . . [E]ncroachment "cannot be justified upon a mere showing of some legitimate state interest." . . . The interest advanced must be paramount, one of vital importance, and the burden is on the

Government to show the existence of such an interest.

*Elrod v. Burns,* 427 U.S. 347, 362, 96 S.Ct. 2673, 2684, 49 L.Ed.2d 547 (1976). *But cf. Braunfeld v. Brown,* 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961) (Sunday closing laws upheld against Saturday Sabbath observer).

There is no case law determining whether the state and federal governments can meet the compelling state interest test so far as the use of social security numbers is concerned. Analogous cases indicate that they cannot. In *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), for example, the Supreme Court held that religious needs outweighed the state's ordinary constitutional power to regulate in the area of unemployment benefits. Plaintiff was a Seventh-Day Adventist whose religion prohibited Saturday work. She had lost her job because she would not work on that day. The state found her unavailable for work "without good cause" and barred her from unemployment compensation. The Court found the state's purposes—prevention of fraud against the benefit fund, and inconvenience to employers—far from compelling, and reversed. In language which could apply with equal force to Mr. and Mrs. Stevens, the Court noted:

> The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand.

374 U.S. at 404, 83 S.Ct. at 1794. *But cf. Yott v. North American Rockwell Corp.,* 428 F.Supp. 763 (C.D.Cal.1977) (government may not require employer to accommodate to employee's religious beliefs).

Congress itself in several instances has recognized a potential conflict between the use of social security numbers and the rights of individuals to freedom of religious belief. Where it has considered the issue, it has resolved it in favor of religious scruples. For example, although all taxpayers ordinarily must acquire social security numbers to work, the Secretary of Health, Education

and Welfare is permitted to exempt such religious groups as the Amish from the obligation to pay social security taxes "if they are, by reason of the tenets of their sect, opposed to receipt of such benefits and agree to waive them." *Wisconsin v. Yoder,* 406 U.S. 205, 223, 92 S.Ct. 1526, 1537, n.11, 32 L.Ed.2d 15 (1972); 26 U.S.C. § 1402(h); S.Rep. No. 404, 89th Cong., 1st Sess., *in* U.S.Code Cong. & Adm.News at 1959 (1965). Similarly, the Social Security Amendments of 1954, P.L. 83-761, 42 U.S.C. § 410(a)(8)(A), allowed clergy the option of joining the social security system or staying out as their consciences dictated. *See* Sen. Rep. No.1987, 83d Cong., 2d Sess., *in* U.S. Code Cong. & Adm.News at 3717-18 (1954). *See also* 26 U.S.C. § 1402(e). It would, of course, be inappropriate to deny necessary aid to the children because of their parents' religious beliefs.

Only one witness testified that the need for the Stevens children to have social security numbers was substantial. The Assistant Commissioner of the New York State Department of Social Services in charge of Field Operations, testified that because the number of welfare recipients has increased at the same time that the number of programs through which aid is filtered has proliferated, the problems of fraud are great. In some instances, employed persons supplement their incomes illegally by continuing to collect unemployment benefits. In others, applicants have overstated the number of children and other dependents making up their household to increase the amount of their aid.

▆ There can be little doubt that the use of social security numbers, combined with computers, is an important tool in efforts to combat such instances of welfare fraud. Admittedly, however, the number is not a perfect device, since millions of people are estimated to hold more than one number or to share a number. Privacy Protection Study Commission, The Use of the Social Security Number in the Private Sector 7 (Memorandum, Oct. 22, 1975). But the evidence produced by the state was entirely unconvincing. It did not prove that the Stevenses, or those few others who might share their beliefs, pose insurmountable problems if their social security numbers cannot be fed into the maws of welfare computers.

There is no suggestion of a threat sufficient in size to compromise the orderly administration of the state or national welfare program, or to render the statutory and regulatory scheme unworkable. This case does not "present an administrative problem of such magnitude, or . . . afford the exempted class so great a competitive advantage, that such a requirement would have rendered the entire statutory [and regulatory] scheme unworkable." *Sherbert v. Verner,* 374 U.S. 398, 408-09, 83 S.Ct. 1790, 1796, 10 L.Ed.2d 965 (1963).

The feasibility of devising some alternative to deal with persons like the Stevenses is suggested by the model of the federal Internal Revenue Service, which has developed other ways to identify members of the clergy who have opted out of the social security system. First Amendment principles demand that such an effort be made. That is the intent of the least drastic means doctrine which is applied regularly in cases dealing with rights protected by the First Amendment. In *United States v. Robel,* 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967), the Supreme Court clearly articulated this idea:

> Our decision today simply recognizes that, when legitimate legislative concerns are expressed in a statute which imposes a substantial burden on protected First Amendment activities, Congress must achieve its goal by means which have a "less drastic" impact on the continued vitality of First Amendment freedoms. . . . The Constitution and the basic position of First Amendment rights in our democratic fabric demand nothing less.

389 U.S. at 267-68, 88 S.Ct. at 425-26 (*footnote and citation omitted*). With the willingness of the plaintiffs to co-operate a matter of record, some method of satisfying both the demands of the temporal and of the Divine can be found.

Undoubtedly, the effort required to accommodate our political and legal system to the extraordinarily diverse and individualistic exercise of rights preserved for us by the Bill of Rights creates strains and inconveniences to the bureaucracy. "It would be more convenient for authorities if all people were the same in religion and outlook." *United States v. Kahane,* 396 F.Supp. 687, 703 (E.D.N.Y.1975). Our Constitution, however, prevents forcing individuals into a single religious mold. As Mr. Justice Jackson observed:

> If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.

*West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943).

When an individual seeks to act on beliefs arguably grounded in religious faith, and such actions will affect others adversely, some limits must be recognized. Because one believes it is God's command to kill, homicide is not justified (although the belief may be the predicate for a claim of delusion and insanity). *People v. Schmidt,* 216 N.Y. 324, 340, 110 N.E. 945, 949 (1916). Nor can religion serve as a cover for mail fraud. *United States v. Ballard,* 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944). Closer to the dividing line, it is improper to have two spouses simultaneously, even when religious tenets approve, *Reynolds v. United States,* 98 U.S. 145, 25 L.Ed. 244 (1878), but it is not improper, under the freedom of religion clause, for the religiously-inspired Amish to keep their children out of high school, *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

In the case before us, plaintiffs seem to fall well within the realm of permissible religious activity. Their refusal to supply social security numbers does no physical, psychic or other harm to the individuals most affected—their children. No concept of *parens patriae* warrants protective intervention by the state. And the deleterious effects of their action on the welfare system is miniscule.

## IV. Conclusion

The New York State Department of Social Services, the Suffolk County Department of Social Services, and the United States Department of Health, Education and Welfare are enjoined from denying to Virginia and David Stevens and to their children public assistance benefits for which they otherwise qualify solely because they refuse, for religious reasons, to obtain social security numbers for the children.

This memorandum contains findings of fact and law and is a final judgment.

SO ORDERED.